UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

─────────────────────────────────── x

JESUS AYALA,

*Plaintiff*,

- against -

CHRISTOPHER RIZZO, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A POLICE OFFICER OF THE NEW YORK CITY POLICE DEPARTMENT; EDWARD VEGA, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A POLICE OFFICER OF THE NEW YORK CITY POLICE DEPARTMENT; SERGEANT JILL PUMA, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS A SUPERVISORY POLICE OFFICER OF THE NEW YORK CITY POLICE DEPARTMENT; SERGEANT MARTIN MERENSKY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A SUPERVISORY POLICE OFFICER OF THE NEW YORK CITY POLICE DEPARTMENT; JOHN/JANE DOES 1-10, POLICE OFFICERS AND NON-UNIFORMED EMPLOYEES OF THE NEW YORK CITY POLICE DEPARTMENT, THE IDENTITY AND NUMBER OF WHOM ARE PRESENTLY UNKNOWN; RICHARD ROES 1-10, SUPERVISORY POLICE OFFICERS OF THE NEW YORK CITY POLICE DEPARTMENT, THE IDENTITY AND NUMBER OF WHOM ARE PRESENTLY UNKNOWN; THE NEW YORK CITY POLICE DEPARTMENT; AND THE CITY OF NEW YORK,

**COMPLAINT AND JURY DEMAND**

**FIRST AMENDED COMPLAINT**

**11-CV-2586 (JBW)(RER)**

*Defendants*.

─────────────────────────────────── x

1

## NATURE OF ACTION

1.      This is an action to recover money damages for the violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution. Also raised are supplemental claims under the laws of the State of New York.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth, Sixth and Fourteenth Amendments to the United States Constitution.

3.      This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 42 U.S.C. §§ 1983 and 1988.

4.      Plaintiff invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any and all State law claims that are part of the same case or controversy giving rise to the federal claims and share the name nucleus of operative facts as the federal claims.

5.      Venue is proper in the United States District Court for the Eastern District of New York because the claims arose, and Plaintiff resides, in this district. 28 U.S.C. §§ 1391(a)-(c) and 1402(b).

## CONDITION PRECEDENT TO SUPPLEMENTAL STATE CLAIMS

6.      Plaintiff has complied with all conditions precedent to the commencement of the supplemental state claims, having timely served, on or about August 26, 2010, a Notice of Claim upon the Defendant CITY OF NEW YORK pursuant to Section 50(e) of the New York General Municipal Law; more than 30 days having elapsed since said service without payment or adjustment; having had a hearing pursuant to Section 50(h) of the New York General Municipal Law on November 18, 2010; and having brought this action in a timely manner.

## PARTIES

7.      Plaintiff JESUS AYALA is, and was at all times relevant to this action, a resident of the County of Queens, in the City and State of New York.

8.      Defendant CITY OF NEW YORK ("CITY") is and was at all times relevant herein a municipal corporation existing under and by virtue of the laws of the State of New York, and having the powers and duties imposed by law thereon, situated in the Eastern District of New York.

9.      At all times relevant to this action, defendant CITY, by its agents, servants, and employees was responsible for the operation, maintenance, and control of defendant NEW YORK CITY POLICE DEPARTMENT (NYPD), and the selection, training, supervision, evaluation, and disciplining of police officers and other NYPD employees.

10.     Defendant POLICE OFFICER CHRISTOPHER RIZZO is, and was at all relevant times herein, a duly appointed agent, employee, officer, and servant of the NYPD. Defendant RIZZO is being sued in his individual capacity and in his official capacity as a police officer of the NYPD.

11.     Defendant POLICE OFFICER EDWARD VEGA is, and was at all times relevant herein, a duly appointed agent, employee, officer, and servant of the NYPD. Defendant VEGA is being sued in his individual capacity and in his official capacity as a police officer of the NYPD.

12.     Defendant POLICE SERGEANT JILL PUMA is, and was at all relevant times herein, a duly appointed agent, employee, officer, and servant of the NYPD. Defendant PUMA is being sued in her individual capacity and in her official capacity as a supervisory police officer of the NYPD.

13.     Defendant POLICE SERGEANT MARTIN MERENSKY is, and was at all

relevant times herein, a duly appointed agent, employee, officer, and servant of the NYPD. Defendant MERENSKY is being sued in his individual capacity and in his official capacity as a supervisory police officer of the NYPD.

14.    All JOHN/JANE DOE Defendants ("DOE Defendants") are, and were at all relevant times herein, officers, employees, and agents of the NYPD. All DOE Defendants actively participated, directly or indirectly, in the unlawful arrest of, and assault and battery upon, Plaintiff on May 28, 2010, and subsequent malicious prosecution of Plaintiff and deprivation of his right to a fair trial. All DOE Defendants are being sued in their individual and official capacities.

15.    All RICHARD ROE Defendants ("ROE Defendants") are, and were at all relevant times herein, supervisory officers, employees and agents of the NYPD. All ROE Defendants actively participated, directly or indirectly, in the unlawful arrest of, and assault and battery upon, Plaintiff on May 28, 2010, and subsequent malicious prosecution of Plaintiff and deprivation of his right to a fair trial. All ROE Defendants are being sued in their individual and official capacities.

16.    At all relevant times herein, the above-named and unnamed individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, employees, officers, and servants of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions and duties. At all relevant times herein, defendants were acting for and on behalf of the NYPD, with the power and authority vested in them as agents, employees, officers, and servants of the NYPD.

17.    At all relevant times herein, defendants acted jointly and in concert with each

other. Each defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other defendants, but each defendant failed and refused to perform such duty, thereby proximately causing Plaintiff's injuries.

## STATEMENT OF FACTS

18.    On the evening of Friday May 28, 2010, at approximately 10:30 p.m., Plaintiff stopped at a Chase Bank at the corner of Union Turnpike and Utopia Parkway, in the Fresh Meadows neighborhood of Queens County, New York, with the purpose of making a withdrawal from the ATM located inside the bank's vestibule.  He had worked late, picked up Chinese food take-out, and thereafter stopped at the ATM on his way home.

19.    That night, Plaintiff was driving his girlfriend's car, a well-maintained 2004 Toyota Corolla.

20.    Plaintiff parked his car on Union Turnpike in a bus stop located directly in front of the bank's entrance, turned the engine off, turned on the vehicle's flashing hazard lights, and proceeded inside the bank vestibule to the ATM.

21.    While conducting his transaction at the ATM inside the bank, Plaintiff saw a marked NYPD patrol car very close to his car. Plaintiff saw a uniformed NYPD police officer beside Plaintiff's vehicle, and it appeared that the officer was writing Plaintiff a ticket.

22.    Plaintiff cancelled his ATM transaction, exited the bank, and approached the police officer, later identified as defendant EDWARD VEGA. Plaintiff explained that it was his vehicle, that he would move it immediately, and asked VEGA to not write him a ticket. The officer refused and continued to write the ticket.

23.    Plaintiff observed that the NYPD patrol car was very close to his vehicle, and appeared to be touching it. The patrol car was parked in front of Plaintiff's vehicle, at an angle,

and it appeared to Plaintiff that the front passenger-side corner of the police vehicle was touching the bumper of Plaintiff's vehicle on the front driver's-side.

24.    Plaintiff got into his vehicle and turned on the engine. Officer VEGA did not say or do anything at that time in response to these actions by Plaintiff.

25.    Plaintiff slowly backed his vehicle up a short distance, approximately three feet, so the cars would no longer be touching, and then stopped his vehicle and placed it in park.

26.    At that time, VEGA ran around to the driver's side of Plaintiff's vehicle, opened the driver's side door, and in an aggressive tone of voice, and using various curses and invectives, accused Plaintiff of attempting to leave the scene.

27.    Plaintiff attempted to explain to VEGA that he was not trying to leave, but rather was moving his vehicle back so that the cars would no longer be touching.

28.    VEGA continued to curse at Plaintiff in an aggressive manner and accuse him of lying and trying to leave the scene.

29.    VEGA then placed his hand on his firearm, and ordered Plaintiff to provide his driver's license.

30.    Plaintiff complied with the officer's order and provided his license. VEGA took Plaintiff's license, entered the police vehicle, and backed the police vehicle up behind Plaintiff's vehicle.

31.    Plaintiff then exited his car and reentered the bank vestibule to conduct his ATM transaction.

32.    Plaintiff exited the bank and observed that a second police car and two additional police officers had arrived on the scene. One of these officers was Defendant CHRISTOPHER RIZZO and the other was a female officer who is believed to be Defendant SERGEANT JILL

PUMA.

33.     Plaintiff approached the driver's door of his vehicle. VEGA then approached Plaintiff. VEGA shoved Plaintiff, causing Plaintiff to stumble. While attempting to steady himself, Plaintiff brushed against VEGA.

34.     At that point, VEGA and RIZZO threw Plaintiff to the ground and began to punch, kick, and beat him. The officers handcuffed Plaintiff, and then continued to physically assault him as he lay on the ground in handcuffs.

35.     Plaintiff had been wearing glasses, and his glasses were knocked from his face and broken during the assault.

36.     During and after the assault, defendant RIZZO repeatedly cursed at Plaintiff and verbally threatened Plaintiff that he would be more viciously beaten when they arrived at the precinct.

37.     Additional police cars and police officers, the exact number and identities of who are presently unknown, arrived at the scene during this time.

38.     It is not presently known whether additional officers besides VEGA and RIZZO participated in the physical assault and beating of Plaintiff.

39.     Plaintiff was eventually pulled from the ground, placed in a police car, and driven to the 107th Precinct, located in the Flushing neighborhood of Queens County.

40.     Defendant SERGEANT JILL PUMA was present at the scene and observed the attack on Plaintiff. As a Sergeant she was charged with supervising the situation and making sure that Plaintiff was not harmed and that his constitutional rights were not violated. She failed to protect Plaintiff or cause Defendants VEGA and RIZZO to refrain from beating him and violating his constitutional rights.

41.    In addition to failing to protect Plaintiff, Defendants VEGA, RIZZO, PUMA and other officers of the NYPD actually enabled and prolonged the attack. In particular, they cordoned off the area where Plaintiff was being attacked, prevented civilians from coming to Plaintiff's aid, and intimidated civilians who tried to intervene and stop the attack.

42.    Defendant RIZZO drove Plaintiff's vehicle, and followed behind the police car in which Plaintiff was driven. Plaintiff heard RIZZO state that he, RIZZO, intended to damage the car Plaintiff had been driving.

43.    At the precinct, Plaintiff was placed in a holding cell. He was verbally harassed and threatened by other police officers, the identities of whom are presently unknown.

44.    At the precinct, Defendant SERGEANT MARTIN MERENSKY conspired with Defendants VEGA, RIZZO, PUMA and other officers of the NYPD by approving of the illegal arrest of Plaintiff. This approval was itself an effort to cover up the attack on Plaintiff.

45.     Plaintiff was bleeding from a large cut on the side of his face, had numerous bruises and scrapes, and pain in his back, wrist, and hand.

46.    An Emergency Medical Technician (EMT) arrived and asked Plaintiff if he wanted to go to the hospital. Plaintiff responded that he did. The EMT left the room.

47.    A police officer, the identity of who is presently unknown, who was present near the holding cell, stated to Plaintiff that the officer "guaranteed" that if Plaintiff went to the hospital, Plaintiff would be handcuffed to a bed and "shitting in [his] pants" for "three days."

48.    When the EMT returned, Plaintiff stated that he changed his mind and did not wish to go to the hospital.

49.    Several officers, the identities of whom are presently unknown, prepared to transport Plaintiff from the precinct to Central Booking. One of these officers expressed concern

about the injury to Plaintiff's face. Plaintiff was given a bandage for his face. He was then taken to Central Booking, where he remained for approximately 20 hours.

50.     Plaintiff finally went before a judge in the evening on Saturday, May 29, 2010, and was released on his own recognizance.

51.     Plaintiff continued to experience great pain and went to the hospital after being released from the courthouse.

52.     A computed tomography (CT) scan taken at the hospital showed that Plaintiff had sustained multiple fractures to his head and face, including his nose and left orbital bone. He also had bruising to the bone of his left index finger, and several ribs on his left side.

53.     The vehicle that Plaintiff was driving on May 28, 2010 sustained significant damage during the time it was in the custody of the police, including numerous dents, scratches, and damage to the driver's side rear-view mirror.

54.     Plaintiff was falsely charged with two counts of Assault in the Second Degree, New York Penal Law § 120.05(3) (causing physical injury to a police officer); two counts of Assault in the Third Degree, New York Penal Law § 120.00(1) (causing physical injury to a person); Obstructing Governmental Administration in the Second Degree, New York Penal Law § 195.05; Resisting Arrest, New York Penal Law § 205.30; and Disorderly Conduct, New York Penal Law § 240.20(1).

55.     Plaintiff was charged with the above offenses in New York City Criminal Court under Docket Number 2010QN033046, based on the sworn deposition of defendant RIZZO.

56.     These false criminal charges stemmed from Defendants VEGA, RIZZO, PUMA, MERENSKY, and other officers conspiring to lie about what had occurred and to cover up the vicious attack on Plaintiff and the blatant violation of his constitutional rights.  This conspiracy

also enabled a meritless prosecution to move forward and constituted a concerted effort by Defendants and other officers of NYPD to subject Plaintiff to an unfair trial.

57.    Plaintiff had to retain counsel and return to court multiple times to defend against these charges.

58.    In furtherance of the misconduct on May 28, 2010, and in an effort to cover-up the misconduct, maliciously prosecute Plaintiff, and subject him to an unfair trial, Defendants RIZZO, VEGA, PUMA and other officers filed false police reports, some of which were approved by Defendant MERENSKY, and Defendants RIZZO and VEGA perjured themselves in the grand jury investigating the false criminal charges against Plaintiff.

59.    Not believing the police testimony, the grand jury refused to return a true bill against Plaintiff, and on September 29, 2010 caused the case to be dismissed against Plaintiff.

60.    Thus, the prosecution terminated in Plaintiff's favor.

## Municipal Liability

61.    There has been a long-standing pattern of police misconduct similar in kind to that which occurred in this case within the NYPD for more than 20 years, and the failure by the CITY to adequately respond to these abuses and to prevent their recurrence demonstrates deliberate indifference to the constitutional rights of civilians in New York City in general and Plaintiff in particular.

62.    The anti-corruption system put in place by former Police Commissioner Patrick V. Murphy in response to the Knapp Commission investigation in the early 1970's was marginalized, starved of resources, and allowed to wither from neglect, such that by the time the Mollen Commission began its investigation in 1992, "only the skeleton of Murphy's system

remained."[1] (Mollen Commission Report at 76). Moreover, "the principle of command accountability had virtually collapsed." (*Id.* at 77). "Our investigation revealed a widespread breakdown in supervision which fueled and protected the corruption we observed." (*Id.* at 80). Instead of rooting out corruption, the Internal Affairs Division understood their mission as "damage control" and "avoiding bad headlines," (*id.* at 71), reflecting "the Department's preference to bury rather than confront the problem of police corruption." (*Id.* at 90).

63. The Mollen Commission, investigating from 1992 to 1994, found that police perjury and falsification of police reports and documents were "the most common form of police corruption facing the criminal justice system." (*Id.* at 36).

64. The Commission found that falsification frequently occurred and that "testilying" – perjured police testimony – was a pervasive practice and "it is widely tolerated by corrupt and honest officers alike, as well as their supervisors" (*id.* at 40). Indeed, the Commission found, "commanding officer[s] not only tolerated, but encouraged, this unlawful practice." (*Id.* at 39).

65. The Commission noted that "the Department's top commanders must share the blame" for the pervasive tolerance of police perjury and falsification. Yet, the Commission reported, "[w]e are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch. Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification." (*Id.* at 41). "Changing attitudes about police falsification depends largely on the Department." (*Id.* at 42).

66. The Mollen Commission "found a police culture that often tolerates and protects

---

[1] Report of the The City of New York Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, July 7, 1994 ("Mollen Commission Report") (available at: http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf).

corruption. We also found that the Department completely abandoned its responsibility to transform that culture into one that drives out corruption [.]" (*Id.* at 107).

67. The pervasive pattern of corruption that the Mollen Commission reported in 1994 – including perjury, "testilying," and falsification of police reports and documents – has continued virtually unabated since that time.

68. The misconduct described above and chronicled by the Mollen Commission occurred in this case. Specifically, after viciously beating Plaintiff, Defendants RIZZO, VEGA, and PUMA filed, and Defendant MERENSKY enabled the filing of, false police reports about what occurred, and RIZZO and VEGA lied before the grand jury about the events.

69. The investigation of the New York State Bar Association's Task Force on Wrongful Convictions released in 2009 found that "government practices" – referring to a range of errors and misconduct by police and prosecutors, including false testimony and the failure to disclose to the defense information mandated by *Brady v. Maryland*, 373 U.S. 83 (1963) – contributed to more than 50% of the 53 New York wrongful convictions studied by the Task Force. (Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, April 4, 2009 ("NYSBA Report"), at 19).[2] In addition, the Task Force identified a much larger number of cases that "d[id] not reveal an actually innocent person being wrongfully convicted," but "nonetheless often reveal[ed]" a pattern of "troubling due process violations that may result in a defendant being denied a fair trial." (*Id.*).

70. There is also a long history of excessive force that has consistently occurred within NYPD, that NYPD has tolerated, fostered, and been deliberately indifferent to and which

---

[2] Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, April 4, 2009 ("NYSBA Report") (available at: http://www.nysba.org/Content/NavigationMenu42/April42009HouseofDelegatesMeetingAgenda Items/FinalWrongfulConvictionsReport.pdf).

persisted on May 28, 2010 when Plaintiff was attacked and subjected to a host of violations of his constitutional rights.

71.    Following the Mollen Commission Report, Amnesty International conducted a study and issued a report in 1996 on police brutality and excessive force perpetrated by officers of the NYPD.[3] The study involved a review of 90 cases of alleged ill-treatment or excessive use of force.

72.    In its report, Amnesty International noted that "[i]n many of the cases examined international standards as well as US law and police guidelines prohibiting torture or other cruel, inhuman or degrading treatment appears to have been violated with impunity… In most of the cases examined police officers were not disciplined or received only minor sanctions.  The 'code of silence' in which police officers refuse to testify against their colleagues appears to have contributed to impunity in many cases."

73.    A 2006 Report by the United Nations Committee on Human Rights concluded that the "War on Terror," in the aftermath of the September 11, 2001 attacks in the United States "created a generalized climate of impunity for law enforcement officers, and contributed to the erosion of what few accountability mechanisms exist for civilian control over law enforcement agencies. As a result, police brutality and abuse persist unabated and undeterred across the country."[4]

74.    In 2007, the United States Department of Justice determined that excessive force was on the rise since the 9/11 tragedy. In particular, DOJ statistics showed that cases involving

---

[3] Amnesty International, *Police Brutality and Excessive Force in the New York City Police Department,* June 1, 1996, AMR/51/36/96 (available at http://www.unhcr.org/reworld/docid/3ae6a9e18.html).

[4] United Nations Committee on Human Rights, *In the Shadow on the War on Terror: Persistent Police Brutality, and Abuse in the United States,* (2006) (available at: http://www2.ohchr.org/english/bodies/cerd/docs/ngos/usa/USHRN15.pdf).

excessive force and other violations of civil rights rose 25% between 2001 and 2007. The federal jurisdiction with the most criminal prosecutions for alleged law enforcement misconduct was Brooklyn, New York – a jurisdiction within New York City and covered by the NYPD – with 11 instances during the first 10 months of the 2011 fiscal year.[5]

75.    A sampling of recent cases further demonstrate the systemic problem with police brutality within the NYPD and the deliberate indifference that NYPD has shown toward the egregious actions of its officers who perpetrate this conduct. Not only is there a pattern of this misconduct, but the acts themselves, which involve atrocities committed with impunity, indicate a tolerance and deliberate indifference to the violations of constitutional rights among the upper ranks of NYPD and the CITY.

76.    In August 1997, Abner Louima, who police mistakenly believed had punched an officer during a brawl outside a Flatbush nightclub, was arrested and sodomized by two police officers with a broomstick inside a bathroom at the 70th Precinct station house in Brooklyn. Police Officer Justin A. Volpe later admitted in court that he rammed the broomstick into Louima's rectum, and was ultimately sentenced to 30 years in prison. The identity of the second officer in the bathroom was never disclosed. A police cover-up of the incident led to charges against three other officers, including Police Officer Charles Schwartz, who in 2002 was sentenced to five years in federal prison for committing perjury. Louima, who suffered a ruptured bladder and colon, later settled with the City for $8.7 million.[6]

77.    In 1999, Amadou Diallo, while standing unarmed in the vestibule of his

---

[5] USA Today, *Police brutality cases on the rise since 9/11*, Dec. 18, 2007 (available at http://www.usatoday.com/news/nation/2007-12-17-Copmisconduct_N.htm).

[6] William Glaberson, "Case Closed, Not Resolved," *New York Times*, Sept. 23, 2002 (available at: http://www.nytimes.com/2002/09/23/nyregion/news-analysis-case-closed-not-resolved.html) (last accessed July 31, 2012).

apartment building in the Bronx, was killed by four white NYPD officers, who contended that Diallo resembled a rape suspect and that they opened fire because they mistakenly believed he was reaching for a weapon. The officers fired 41 bullets, striking Diallo 19 times. The four officers were subsequently acquitted of criminal charges in relation to Diallo's death. In 2004, the City settled with Diallo's family for $3 million.[7]

78.    On March 1, 2000, 23-year-old Malcolm Ferguson was shot in the head at point-blank range inside 1045 Boynton Avenue in the Bronx by NYPD Police Officer Louis Rivera, a member of an anti-drug enforcement team. The Bronx District Attorney's Office conducted an investigation and decided not to charge Rivera with any crime. A civil jury subsequently awarded Ferguson's family $7 million, including $2.7 million in punitive damages, finding that Officer Rivera had used excessive force, that his conduct was "wanton, reckless or malicious," and that he acted with complete regard for Ferguson's rights.[8]

79.    On March 16, 2000, Patrick Dorismond, a security guard and father of two, was shot in the chest by Police Officer Anthony Vasquez during an altercation that ensued after Vasquez's partner, who was undercover, asked Dorismond where he could buy drugs and Dorismond took offense at the insinuation that he was a drug dealer. Dorismond's friend who was present stated that the officer initiated the physical confrontation by hitting Dorismond first; Vasquez came to his partner's aid and shot Dorismond, killing him. A grand jury subsequently

---

[7]   Jane Fritsch, "The Diallo Verdict Overview," *New York Times*, Feb. 26, 2000 (available at: http://www.nytimes.com/2000/02/26/nyregion/diallo-verdict-overview-4-officers-diallo-shooting-are-acquitted-all-charges.html?src=pm); Suzanne Goldenberg, "NYPD Pays $3m After Killing Man," *The Guardian*, Jan. 7, 2004 (available at: http://www.guardian.co.uk/world/2004/jan/08/usgunviolence.usa).
[8]   *Ferguson v. City of New York, et al.*, 73 A.D.3d 649 (1st Dept., 2010); "The Death of Malcolm Ferguson: an Investigative Report," Office of the Bronx County District Attorney (available at http://bronxda.nyc.gov/misc/malcolm.htm).

declined to indict Vasquez. In March 2003, the City settled with Dorismond's family for $2.25.[9]

80.    On May 22, 2003, Ousmane Zongo, who worked repairing musical instruments at a Manhattan storage facility, was shot in the back and killed by undercover police officer Bryan Conroy, who was investigating a CD and DVD piracy operation at the same storage facility. Zongo was unarmed and was not linked to the pirating scheme. Conroy was convicted of criminally negligent homicide and sentenced to probation. At Conroy's sentencing, the judge placed blame for Zongo's death squarely on the NYPD's "insufficient" training, supervision, and leadership. In 2006, the City settled a wrongful death suit with Zongo's widow for $3 million.[10]

81.    In 2006, Stephanie Adams was assaulted by police officers and arrested after an argument with a taxi driver. In February 2012, a Manhattan jury found that the police officers used excessive force and awarded Ms. Adams $1.2 million in damages.[11]

82.    On November 25, 2006, five undercover police officers in Jamaica, Queens, opened fire on a group of men outside a strip club. The officers had been investigating claims that the club was promoting prostitution. Sean Bell and his friends were leaving the club where they had just celebrated Bell's bachelor party. Bell was killed and two of his friends, Trent Benefield and Joseph Guzman, were severely injured. The officers fired more than 50 bullets

---

[9] William Glaberson, "City Settles Suit in Guard's Death by Police Bullet," *New York Times*, March 13, 2003 (available at: http://www.nytimes.com/2003/03/13/nyregion/city-settles-suit-in-guard-s-death-by-police-bullet.html); "No Trial For Dorismond Shooter," CBS Evening News, March 25, 2000 (available at: http://www.cbsnews.com/stories/2000/03/25/national/main176270.shtml).

[10] Anemona Hartocollis, "Former Officer Gets Probation in Homicide," Dec. 10, 2005 (available at: http://www.nytimes.com/2005/12/10/nyregion/10sentence.html?ref=ousmanezongo); Michael Brick, "Suit is Settled in 2003 Killing of Immigrant," *New York Times*, July 21, 2006 (available at: http://www.nytimes.com/2006/07/21/nyregion/21zongo.html?ref=ousmanezongo).

[11] "Ex-Playmate Wins Excessive Force Judgment Against NYPD," Feb. 22, 2012 (available at: http://newyork.cbslocal.com/2012/02/22/ex-playboy-playmate-wins-excessive-force-lawsuit-against-nypd/).

within seconds; one of the officers fired 31 rounds, emptying two full magazines and pausing to reload at least once. Despite the officers' claims that they were fired upon, the ballistics evidence indicated that only the police's firearms were discharged. Three of the officers, who were later charged with crimes ranging from manslaughter to reckless endangerment, were acquitted after trial. In May 2010, the City reached a settlement with Benefield, Guzman, and Bell's family for $7.15 million.[12]

83.     On October 15, 2008, Michael Mineo was assaulted on a Brooklyn subway platform by five police officers, one of whom allegedly sodomized Mineo with a retractable police baton. The officer accused of sodomizing Mineo, Richard Kern, had twice before been the subject of excessive force complaints made to the Civilian Complaint Review Board. The police department failed to investigate Mineo's allegations promptly, and the investigation was taken up by the Brooklyn District Attorney's office, who indicted three officers for the attack on Minneo and subsequent cover up. The three officers were later acquitted after trial.[13]

84.     In February 2011, 19-year-old Jorge Cartegena, Jr. was beaten by police officers in a Bronx deli, arrested, and released 24 hours later with a summons for riding his bicycle on

---

[12] Al Baker, "3 Detective Are Indicted in 50-Shot Killing in Queens," *New York Times*, March 17, 2007 (available at: http://www.nytimes.com/2007/03/17/nyregion/17grand.html);Diane Cardwell, "Mayor Says Shooting Was 'Excessive'," *New York Times*, Nov. 27, 2006 (available at: http://www.nytimes.com/2006/11/27/nyregion/28shootcnd.html); Deborah Feyerick, "Acquittals in Groom's Shooting Spark Outrage," *CNN*, April 25, 2008 (available at: http://articles.cnn.com/2008-04-25/justice/sean.bell.trial_1_gescard-isnora-nicole-paultre-bell-detective-marc-cooper?_s=PM:CRIME); John Riley, "$7.2m Settlement in Sean Bell Wrongful Death Case," *Newsday*, July 27, 2010 (available at: http://www.newsday.com/news/new-york/7-2m-settlement-in-sean-bell-wrongful-death-case-1.2145000).

[13] Liz Robbins, "Three Officers Charged in Brooklyn Assault," *New York Times*, Dec. 9, 2008 (available at: http://www.nytimes.com/2008/12/10/nyregion/10officers.html); Al Baker, "Brooklyn Prosecutor Details Case Against Officers," *New York Times*, Dec. 9, 2008 (available at: http://cityroom.blogs.nytimes.com/2008/12/09/officers-surrender-in-assault-case/?ref=nyregion); Kareem Fahim, "Officers Acquitted in Mineo Trial," New York Times, Feb. 22, 2010 (available at: http://www.nytimes.com/2010/02/23/nyregion/23mineo.html).

the sidewalk. Despite bruises and other injuries to Cartegena, and surveillance footage from inside the deli showing the officer's use of force against him, the Internal Affair Bureau quickly cleared the officers of wrongdoing.[14]

85.    In early June 2012, New York State Court judge Thomas Raffaele witnessed two police officers roughly subduing a suspect on the ground in Jackson Heights, Queens. A crowd had gathered and Raffaele was "concerned that things might get out of control," and therefore called 911 and requested that back-up be sent to the area at once. While the suspect was handcuffed on the ground, one of the officers kneed the suspect in the back. When someone in the crowd yelled at the officers for this, an officer lunged at the crowd and struck Raffaele in the throat.[15]

86.    The failure to discipline and train by NYPD and the Defendant CITY is, in essence, ratification of the type of misconduct that occurred in this case.

87.    As a direct and proximate result of defendants' actions, Plaintiff suffered injuries and damages, including:

    a.    Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution;

    b.    Violation of his constitutional rights under the New York State Constitution;

    c.    Violation of various state torts;

---

[14]    "Dad, Son Claim Excessive Force by NYPD," ABC Eyewitness News, Feb. 21, 2011 (available at: http://abclocal.go.com/wabc/story?section=news/local/new_york&id=7971489); Jon Del Signore, "Cops Cleared in Teen Bicyclist Bodega Arrest," *Gothamist*, Feb. 23, 2011 (available at: http://gothamist.com/2011/02/23/cops_cleared_in_teen_bicyclist_bode.php).
[15]    CBS News, "State Court Judge Says NYPD Officer Used Excessive Force Against Him," June 6, 2012 (available at http://newyork.cbslocal.com/2012/06/06/state-court-judge-says-nypd-officer-used-excessive-force-against-him/).

d.      Physical injury, pain and suffering, and emotional pain and suffering; and

e.      Monetary damages in the form of medical expenses, legal expenses, lost wages due to time missed from work, damage to Plaintiff's career advancement, and to physical property.

## FIRST CLAIM FOR RELIEF

### (42 U.S.C. § 1983 False Arrest and False Imprisonment)

88.     Plaintiff repeats and realleges paragraphs 1 through 87 as if fully set forth herein.

89.     Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants, acting individually and in concert and within the scope of their authority, under color of law, committed the state tort of false arrest and false imprisonment, in that defendants intentionally arrested and caused Plaintiff to be imprisoned without probable cause, with his knowledge and without his consent, in violation of his rights to be free from unreasonable search and seizure and to due process of law under the Fourth and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of New York.

90.     Plaintiff asserts this claim against all defendants.

## SECOND CLAIM FOR RELIEF

### (42 U.S.C. § 1983 Excessive Force)

91.     Plaintiff repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

92.     Defendants VEGA, RIZZO, PUMA, the DOE defendants, and the ROE defendants, acting individually and in concert and within the scope of their authority, under color of law, used objectively unreasonable and excessive force in effecting Plaintiff's arrest and committed the tort of assault and battery, in violation of Plaintiff's rights to be free from unreasonable seizure and to due process of law under the Fourth and Fourteenth Amendments to

the United States Constitution, and in violation of the laws of the State of New York.

93.     Plaintiff asserts this claim against defendant VEGA, RIZZO, PUMA, the DOE defendants and the ROE defendants.

### THIRD CLAIM FOR RELIEF

### (42 U.S.C. § 1983 Malicious Prosecution)

94.     Plaintiff repeats and realleges paragraphs 1 through 93 as if fully set forth herein.

95.     Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants, and the ROE defendants, acting individually and in concert and within the scope of their authority, under color of law, maliciously caused a criminal prosecution to be initiated against Plaintiff, without probable cause, as a result of which Plaintiff was deprived of his liberty and due process of law in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of New York.

96.     Plaintiff asserts this claim against all defendants.

### FOURTH CLAIM FOR RELIEF

### (42 U.S.C. § Malicious Abuse of Process)

97.     Plaintiff repeats and realleges paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants, and the ROE defendants, acting individually and in concert and within the scope of their authority, under color of state law, maliciously used legal process, in the form of a criminal prosecution against Plaintiff, with the intent to harm Plaintiff and without excuse or justification, for a collateral purpose outside of the legitimate ends of justice, namely to conceal their own wrongdoing in unlawfully assaulting and beating Plaintiff, in violation of Plaintiff's rights under the Fourth and

Fourteenth Amendments to the United States Constitution, and the laws of the State of New York.

99.    Plaintiff asserts this claim against all defendants.

## FIFTH CLAIM FOR RELIEF

### (42 U.S.C. § 1983 Violation of Fair Trial)

100.    Plaintiff repeats and realleges paragraphs 1 through 99 as if fully set forth herein.

101.    Defendants VEGA, RIZZO, PUMA and MERENSKY, the DOE defendants, and the ROE defendants, acting individually and in concert and within the scope of their authority, under color of state law, fabricated evidence and forwarded it to prosecutors and Defendants VEGA and RIZZO lied in the grand jury, and this fabricated evidence was likely to influence a jury's decision.

102.    This claim is alleged against all defendants.

## SIXTH CLAIM FOR RELIEF

### (42 U.S.C. § 1983 *Monell* claim against Municipal Defendants)

103.    Plaintiff repeats and realleges paragraphs 1 through 102 as if set forth fully herein.

104.    At all times material to this complaint, Defendant CITY OF NEW YORK, acting through Mayor Michael Bloomberg, Police Commissioner Raymond Kelly, and the NYPD, adopted, instituted, and maintained *de facto* policies, practices, and customs exhibiting complete indifference to the constitutional rights of citizens.

105.     These *de facto* policies, practices, and customs include: (a) the failure to properly screen, supervise, discipline, transfer, counsel and/or otherwise control police officers engaged in the excessive and unjustified use of force, particularly those officers who are repeatedly accused

of such acts; (b) the failure to properly train and supervise police officers to avoid the use of punitive, cruel and excessive force; and (c) the police officer "code of silence" wherein police officers regularly cover up police use of excessive and unjustified force by telling false and incomplete stories, or by failing to report the use of excessive and unjustified force by other police officers.

106.    These *de facto* policies, practices, and customs are a direct and proximate cause of the conduct alleged herein and a direct and proximate cause of the injuries sustained by Plaintiff.

107.    Defendant CITY OF NEW YORK did negligently hire, train, and supervise the individual defendants, VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants, and the ROE defendants, who participated, directly and indirectly, in the assault and unlawful arrest of Plaintiff on May 28, 2010, and who were unfit for the performance of police duties on that day.

108.    Defendant CITY OF NEW YORK knew of the need for additional screening, training, supervision, and disciplining of police officers to refrain from making arrests or instigating prosecutions in bad faith and without probable cause; refrain from using excessive force in effecting arrests; refrain from abusing their authority; and refrain from falsifying evidence or giving false testimony.

109.    Through intentional and deliberate indifference, the CITY OF NEW YORK failed to adequately provide for screening, training, supervising, and disciplining of police officers with respect to the above mentioned issues. This type of intentional misconduct and deliberate indifference is evidenced by evidenced by various acts of misconduct in this and prior cases including but not limited to excessive force, the falsification of evidence, giving false testimony, and generally failing to act in a reasonable, professional and honest capacity.

110.    Upon information and belief, police officers have not been disciplined by the

22

Defendant CITY OF NEW YORK or NYPD for their misconduct, despite repeated judicial findings that NYPD police officers engaged in misconduct. Such failure to respond to, and take corrective action with respect to, wrongdoing by members of the NYPD constitutes deliberate indifference toward the constitutional rights of the people with whom police come into contact, and such action, or inaction, constitutes a practice, pattern and custom of engaging in police misconduct including, but not limited to lying in police reports, giving false testimony, making arrests and instigating criminal prosecutions without probable cause, covering up misconduct, and subjecting falsely accused criminal defendants to trials based on false evidence.

111.    The NYPD and the CITY OF NEW YORK knew that the need for adequate screening, training, supervising, and disciplining of its employees was, and is, compelling because of the course of action of those police personnel, including Defendants VEGA, RIZZO, PUMA and MERENSKY and the other NYPD defendants, to abuse their authority, beat people with impunity, lie about and cover up the misconduct, make arrests without probable cause and advance prosecutions with deliberate and total disregard for the truth and for the constitutional rights of the people they are supposed to serve and protect.

112.    But for the CITY OF NEW YORK's deliberate indifference in failing to adequately provide screening, training, supervision, and discipline of police officers and its affirmative acts, the innocent Plaintiff would not have been assaulted, beaten, and wrongly arrested, prosecuted and subject to an unfair trial.

113.    The aforesaid conduct operated to deprive Plaintiff of well-established rights under the Fourth and Fourteenth Amendments to the United States Constitution and the rights established by the Constitution of the State of New York, including Plaintiff's right to be free from excessive force, bad-faith prosecutions, unfair trials, and his right to freedom from the

deprivation of liberty without due process of law.

114.   These violations of Plaintiff's Constitutional rights were directly and proximately caused by Defendant CITY OF NEW YORK's deliberate indifference to the Constitutional rights of persons coming into contact with the NYPD.

115.   With respect to all of the wrongful actions and omissions alleged above, Defendant CITY OF NEW YORK knew to a moral certainty that its employees would confront such situations, that adequate screening, training, equipment, supervision, and discipline would have made the CITY's employees' choices less difficult, and there is a clear history of employees mishandling such situations, and that wrong choices by the defendant CITY's employees frequently result in deprivations of citizens' Constitutional rights.

116.   The violations of Plaintiff's Constitutional rights as stated above comprised Constitutional torts and were affected by actions undertaken under color of law of the State of New York.

117.   By reason of the foregoing, Defendant CITY OF NEW YORK is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (False Arrest and False Imprisonment Under New York Common Law)

118.   Plaintiff repeats and realleges paragraphs 1 through 117 as if set forth fully herein.

119.   Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants, acting individually and in concert and within the scope of their authority, falsely arrested and imprisoned Plaintiff, intentionally, with Plaintiff's knowledge and without his consent, and without probable cause, a warrant, or any legal right or authority to do so.

120.    Defendants VEGA, RIZZO, PUMA, MERENSKY the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by Defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

121.    Plaintiff asserts this claim against all defendants.

### EIGHTH CLAIM FOR RELIEF

### (Malicious Prosecution Under New York Common Law)

122.    Plaintiff repeats and realleges paragraphs 1 through 121 as if set forth fully herein.

123.    The individual and in concert acts of defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants, constitute malicious prosecution under the laws of the State of New York.

124.    Defendants caused criminal proceedings to be brought against Plaintiff, without probable cause and with malice, and the proceedings terminated in Plaintiff's favor.

125.    Defendants VEGA, RIZZO, PUMA and MERENSKY, the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

126.    Plaintiff asserts this claim against all defendants.

### NINTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress
### Under New York Common Law)

127.    Plaintiff repeats and realleges paragraphs 1 through 126 as if set forth fully herein.

128.    Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants, acting individually and in concert and within the scope of their authority,

engaged in outrageous and extreme conduct, utterly intolerable in a civilized society, and thereby intentionally caused extreme emotional distress to Plaintiff.

129.    Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

130.    Plaintiff asserts this claim against all defendants.

## TENTH CLAIM FOR RELIEF

### (Excessive Force Under New York Common Law)

131.    Plaintiff repeats and realleges paragraphs 1 through 130 as if set forth fully herein.

132.    The acts and conduct of defendants VEGA, RIZZO, PUMA, the DOE defendants and the ROE defendants acting individually and in concert constituted excessive force upon the Plaintiff, in that they used objectively unreasonable force in effecting Plaintiff's arrest.

133.    Defendants VEGA, RIZZO, PUMA, the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

134.    Plaintiff asserts this claim against all defendants, except Defendant MERENSKY.

## ELEVENTH CLAIM FOR RELIEF

### (Assault Under New York Common Law)

135.    Plaintiff repeats and realleges paragraphs 1 through 134 as if set forth fully herein.

136.     Defendants VEGA, RIZZO, PUMA the DOE defendants and the ROE defendants, acting individually and in concert and within the scope of their authority,

26

intentionally, willfully, and maliciously assaulted Plaintiff in that they had the real and apparent ability to cause harmful and/or offensive bodily contact to Plaintiff, did a violent and/or menacing act which threatened such contact to Plaintiff, and thereby caused Plaintiff to apprehend harmful and/or offensive bodily contact.

137. Defendants VEGA, RIZZO, PUMA, the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

138. Defendant asserts this claim against all defendants except Defendant MERENSKY.

## TWELFTH CLAIM FOR RELIEF

### (Battery Under New York Common Law)

139. Plaintiff repeats and realleges paragraphs 1 through 138 as if set forth fully herein.

140. Defendants VEGA, RIZZO, PUMA, the DOE defendants and the ROE defendants, acting individually and in concert and within the scope of their authority, intentionally, willfully, and maliciously battered Plaintiff, in that they, in a hostile and/or offensive manner, struck Plaintiff without his consent and with the intention of causing harmful and/or offensive bodily contact to Plaintiff, and caused such battery.

141. Defendants VEGA, RIZZO, PUMA, the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

142. Plaintiff asserts this claim against all defendants except Defendant MERENSKY.

## THIRTEENTH CLAIM FOR RELIEF

### (Negligent Infliction of Emotional Distress
### Under New York Common Law)

143.    Plaintiff repeats and realleges paragraphs 1 through 142 as if set forth fully herein.

144.    Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants, acting individually and in concert and within the scope of their authority, engaged in extreme and outrageous conduct, utterly intolerable in a civilized society, which negligently caused extreme emotional distress to Plaintiff.

145.    Defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants were at all times employees acting within the scope of their employment by defendant CITY OF NEW YORK, which is therefore responsible for their conduct.

146.    Plaintiff asserts this claim against all defendants.

## FOURTEENTH CLAIM FOR RELIEF

### (Negligent Hiring, Retention, Supervision and Training
### Under New York Common Law)

147.    Plaintiff repeats and realleges paragraphs 1 through 146 as if set forth fully herein.

148.    Defendant CITY OF NEW YORK, through the NYPD, negligently hired, screened, retained, supervised, and trained the individual defendant police officers herein, defendants VEGA, RIZZO, PUMA, MERENSKY, the DOE defendants and the ROE defendants.  These individual police officers were unfit for the performance of police duties on May 28, 2010.

149.    Plaintiff asserts this claim against the defendants NYPD and CITY OF NEW

YORK.

## **JURY DEMAND**

150.    Plaintiff hereby demands trial by jury of all issues properly triable thereby.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief jointly and severally against all the

defendants:

a.    Compensatory damages in an amount to be determined at trial;

b.    Punitive damages in an amount to be determined at trial;

c.    Reasonable attorneys' fees and costs of this litigation; and

d.    Such other relief as this Court deems just and proper.

Dated:    New York, New York
         July 31, 2012

                                        Respectfully submitted,

                                        //s//
                                        _____
                                        GLENN A. GARBER
                                        350 Broadway, Suite 1207
                                        New York, New York 10013
                                        (212) 965-9370